This morning, Coddington v. Carpenter, case number 166295. Counsel, we are ready to proceed. Mr. Carlson. May it please the court, Judge Lucero, counsel, Mr. Walpert, I'm John Carlson. I don't think it's a surprise based on the 28-J traffic that's saturated your inbox. I want to talk about the right to present a defense claim this morning, which means I want to talk about the exclusion of Dr. Smith's expert psychiatric opinion that James Coddington, because of acute cocaine intoxication, could not form the specific intent to kill the mens rea required to sustain Mal's murder. Now, I think it's helpful to orient ourselves about what the state appellate court said and did. You're not arguing that that bears on the Miranda issue, but only independently goes to mens rea? Correct. What I hope to talk about for the next 28 minutes has little or nothing to do with the Miranda issue. If you feel differently, I'll change my mind. This is an independent error having no roots in the Miranda claim. So let's remember what the OCCA, the Oklahoma Court of Criminal Appeals, said and did with the right to present a defense claim. First, it said Dr. Smith's opinion was wrongly excluded under Oklahoma law. Two, it recognized that exclusion violated Mr. Coddington's constitutional rights. But third, the error applying Chapman v. California was harmless beyond a reasonable doubt. Now, my first and primary task is to persuade you that the OCCA's harmlessness determination was an objectively unreasonable application of Chapman. And to do that, I'm going to lash myself Odysseus-like to the semantic mast of the OCCA's decision. That is, its words. I mean, I don't think there's going to be any surprise about the words that we're going to talk about. With no sirens chasing you around. Well, there is a siren chasing me, or I'm trying to avoid. And it's what I admit is the difficult 2254-D standard I must surmount before we talk about anything else. Or I should have said, no sirens luring you away. More aptly put. The first phrase I'm going to remind you of is the OCCA's declaration that the excluded evidence was not just material. It was certainly material. And given that, I can distill my right to present a defense claim as an unreasonable application of Chapman in one sentence, the exclusion of material evidence can never be harmless error by definition. Did you have a question? Are you going to the argument you made in your 28-J letter you filed this week on, I'm trying to think of the case name, I've got it in my notes here. It seemed to be you were making this argument for the first time in your 28-J letter. I filed two such cases. Basically, so this is akin to Brady evidence and that it's automatic. The briefs very definitely cite Valenzuela-Bernal, which imports the materiality standard from the Brady line of cases into the right to present a defense case. I cited that case. And that's the first time you'd cited that and made that argument, wasn't it, in your 28-J letter? Quite incorrect, Your Honor. My reply brief cites and quotes from and relies on Valenzuela- Bernal repeatedly, page 12 to 14. In terms of talking about the, comparing it, the exclusion of evidence that we had here to the exclusion of opinion testimony that we had in this case. In that case, it was exclusion. I mean, the government basically deported a witness. You're right. So it's the total exclusion of evidence. It's unavailable. We're here, this expert testified his opinion was excluded. And I didn't see any case law that would compare the two, I guess is what I'm saying. And I don't recall that you did that in your reply brief. No, and in my 28-J letter, I'm not suggesting that there was the total exclusion of Dr. Smith's testimony. There wasn't. He testified a lot and I never have denied that. He gave the jury a lot of information about cocaine addiction. What he was prevented from saying was the critical and reliable opinion that negated by itself an element of malice murder. The problem with his testimony, Judge Ward, is the jury could perfectly well accept every fact he was allowed to say. Mr. Coddington wasn't thinking rationally, he was impaired, he was paranoid, and still the jury could convict him based on its findings that he intended to kill. None of those facts were inconsistent, in other words, with a conviction. The jury could not, however, in contrast, accept his excluded opinion and convict. The jury was instructed with the voluntary intoxication instruction. They understood that they had to decide whether he had the requisite intent. They were given all kinds of evidence about his voluntary intoxication and how that would impair his ability to form the intent. Not the specific testimony that you are speaking of, but, and then he himself testified, I believe, that he couldn't have formed the intent. And I think defense counsel pretty strongly made that argument in closing argument. The jury certainly seemed to have understood what they were supposed to do with this evidence about his level of voluntary intoxication. I'm going to quibble with you on that, Judge Moritz. I think it's at least, you ought to have at least grave doubt as to whether the jury took precisely the opposite inference from his testimony. For as the OCCA noted, what was conspicuously absent, notable was the OCCA's term, from his testimony was the one thing that would have forced an acquittal. So I think it's at least possible. Well, more than that, I have to show you more than that. I think it's an equipoise whether the jury assumed that Dr. Smith in fact believed he had the intent, he, Mr. Coddington, had the intent to kill. Otherwise he would have said so for precisely the reason Judge Moritz you cite. He said a lot of other things. As the OCCA said, he was allowed to testify. It seemed to everything, save what really mattered. There was, I think that the question about whether the jury believed is, I think, interesting because that's something that in finding the evidence material, I think the jury said, or the jury, the OCC said, if the jury believed this, it certainly could have factored it in, in terms of the degree of the homicide. But then it seemed to me that what the OCCA was saying was, we don't think the jury believed it because of all this other evidence. And some of it was his own actions, very specific actions in surrounding the crime that would indicate he knew exactly what he was doing. Two things. First, I OCCA didn't detail that evidence, but it's part of the record. Yes. And I don't deny that evidence. Two things in response. First, I'm not questioning whether the evidence was sufficient. Mr. Coddington, even on this element, it was, that's not the issue. The question is what was excluded from the jury's deliberations. Two, the OCCA pushed, advanced my argument perhaps more than I have by calling it the incoherence of calling material evidence harmless. The OCCA made a bad problem worse. Recall what the OCCA said immediately after calling the evidence harmless. The reason it was harmless is Dr. Smith's testimony would not have completely exonerated Mr. Coddington, but quoting the OCCA, if believed by the jury. And by the way, that's no different than any right to present a defense case. The witness in Valenzuela who was exported, defense, his testimony would have had to be in believed to be viable. So the mere fact that the finding had to be believed is not, I think, a crippling fact, but let me return to what the OCCA said. Dr. Smith's testimony, if believed, might certainly have reduced the degree of homicide for which Mr. Coddington was convicted. That was the whole point of calling Dr. Smith was to reduce the degree of homicide. Could you address the state's argument that they, they seem to focus on in their response brief that you don't have your, your habeas petition here is not based on clearly established federal law. And we've said fairly recently in the house case, interpreting U.S. Supreme court, fairly recent case law, that that's a threshold requirement. We can't get any further. We can't talk about D1 or D2 without that threshold, clearly established federal law. And as you know, federal law doesn't even permit the federal rules of evidence in particular. And I'm not talking yet about the Supreme court, but it doesn't even permit this opinion testimony. It prohibits it under the federal rules and the Supreme court in the closest case I could find that cited was cited in a 28 J letter. The Clark case would seem to say, yeah, this doesn't implicate his right to present his constitutional right to present a defense. This opinion testimony. So I'm, and that clearly established federal law has to be based on specific, you know, the case with the most specific or facts, the most akin. And it seems to me that Clark case is sorry about the long question. No, I'd like you to address that because I think it's a very important argument. If that is the threshold question. I agree. It is important. It's the heart of this case. And I, I, I sense two issues in your question, which isn't long. It's fair. And to the point, let me pull them apart. I'm sure I agree, but yeah, pull them apart first, just to be clear, my argument is not, and had never has been the exclusion of Dr. Smith's evidence by itself, just free floating exclusion violates the constitution. It most certainly does not rule seven or four B forecloses that argument. My argument is that the priors make the exclusion of Dr. Smith's evidence. The priors I'm referring to is a state created right to defend yourself from malice murder on the basis of voluntary intoxication bolstered by a state created right to present expert testimony in advance of that defense. So my argument to be very clear is once the state has created these rights, unlike Arizona, which denied Clark the diminished capacity of defense, unlike say the state of Montana, which denied Engelhoff the same right, Oklahoma took a different path. It granted defendants this right to present an intoxication defense and it allowed such a defense to present expert testimony, and then without justification, that's what it means to be erroneously denied, the state stripped Coddington of that right. Bingo. That's the violation of the constitution. Now let me address the clearly established, unless there's a question about before. No, let's get to the expert then, because staying on point, Oh, what was the expert an expert in and what would his testimony have been that goes to the issue of the violation of the right to introduce evidence of intoxication as a defense? Volume five, page 81 of the trial record, you will find the proffer from Dr. Smith, an expert in psychiatry who would have testified that because of Mr. Coddington's long-time addiction to cocaine, amplified by the three-day binge on crack cocaine, he could not possibly have formed the specific intent to kill. That was what the jury was denied. He could not consider that opinion as it weighed the evidence. So are the rulings on intoxication broad enough to include drug impairment? Yes. The jury was specifically instructed that drugs are among the intoxicating toxins that could impair Mr. Coddington's intent if the jury accepted that. Did any, was any other evidence introduced on that basis? No, that's very important. The excluded evidence was not presented in any other form, neither a witness nor a doc, nor any document supplied what Dr. Smith could have said, which isn't to say to repeat that the jury was ignorant about the effects of cocaine on Mr. Coddington. It got quite an education, but it didn't get the critical negating element, negating evidence. And I'm itching to get back to House if, unless there's a question. I want, I haven't forgotten that because I do view that as, as a problem. Well, you know, in House we pointed out what the court already said and the Supreme Court said in Kerry, which is the Supreme Court holdings, the Supreme Court holdings are the exclusive touchstone for clearly established federal law and they must be construed narrowly and consist only of something akin to on-point holdings. Why doesn't Clark, the Supreme Court's holding in Clark, control this case and say that there is no clearly established federal law, so we don't make it past that threshold determination in this circumstance? Well, because as I said, Arizona denied the... I understand that, but we're still talking about clearly established federal law that must be based on Supreme Court holdings. But what's important in both Clark and I think House is there was no finding of constitutional error in the state court. That is in sharp contrast to... There's still a threshold question. But I'm... And that was the case in House. Wasn't House the case where there was the threshold determination by the state court that Batson applied? No. Am I getting that? The state court rule, what happened is... Not that Batson applied, when they applied Batson, they decided it didn't apply. But this court said Batson didn't apply in the first instance. There was no clearly established federal law saying that Batson applied in the first instance. So the state court got that wrong. And the defendant certainly wasn't making that argument. Judge Moore, with due respect, I think you're wrong. Okay. When you read House, I hope... I did read House. You will see that the state court of New Mexico refused the equal protection challenge to the change of venue that was at issue. So there was no constitutional... They attempted to... They discussed Batson and decided that Batson didn't apply. Didn't extend to venue. But this court said, you shouldn't even have got to Batson because Batson hadn't been extended to these venue changes. And so it backed it up a notch, which is what we're doing here. We're backing it up a notch and said, Oklahoma Supreme Court, you should not have even talked about this being a constitutional, essentially a denial of a there being some clearly established federal law. Well, I say that the Oklahoma Court of Appeals wasn't even discussing clearly established federal law. This was a direct appeal. They were interpreting the law as they saw it. But we have the obligation to decide as a threshold matter, whether this is based on clearly established federal law. Yeah. Well, let me on that point. No, no. I want, I don't mean, I'm not interrupting. I just want to pursue Judge Lawrence's point. On the issue of whether the violation of a state granted right, there, isn't there Supreme Court law that says that the U.S. Constitution due process clause does grant relief on that point? Yes. If the right is substantial. What are those cases? Hicks versus Oklahoma. But I want to, I want to, why don't I just say it? Cause this is what I've been itching to. Well, don't just stop itching and just say it. I want to replace the analog in your mind from Clark House to Ayala. The distinction here is that in Ayala, we have the analogous situation. We have a finding of constitutional error. But harmless and Ayala's lights the pathway. The first pass is to show the 2254 D violation that was found in the state court, though it ruled harmless. Ayala says, the first thing you do is ask whether that was a clearly an objectively unreasonable application of Chapman. And so Ayala is the more appropriate analog because there, the case arrived in the federal courts with the air that I have presented you, unlike house, unlike Clark, they could not get through the constitutional portal. So when they arrived in the federal courts, they did not have what I have, which is a judgment from the state court, a final judgment declaring the error constitutionally harmless. You draw then from the Ayala Frye versus Plyler line of cases, which isn't to say I can walk out of this courtroom writ in hand without persuading you that Mr. Coddington's rights were violated, constitutional right to violate. The question is under what standard and when do I do it? My position is the first question is, did the state court get Chapman right? If it did, game over, I lose. If I'm correct, if you're persuaded that the exclusion of material evidence can never be harmless, then you put to me the question under the novel review, having surmounted 2254D's precondition to relief, do I have a constitutional violation? And if so, did I suffer actual prejudice? Now I'm ready to fight with you about whether I have a constitutional violation, but I'm free of the limited source of law that I can draw because I have penetrated through, I have surmounted 2254D's precondition to relief. Unless there are other questions, I think I want to save the balance of my time for the next question. May it please the court. I'm Caroline Hunt from the Oklahoma attorney general's office on behalf of respondent. This court should hold that the court of criminal appeals Chapman harmlessness determination. I think that you should not be like Dionysius walking around with a lantern in the light of day to try to outdo Mr. Carlson on his Greek rhetoric. But I I'd like to ask you a point that he did make that I think is, is a bit troubling. Does Oklahoma in fact extend a, an intoxication defense to a mens rea on mens rea? Yes, Your Honor. And, uh, did the defendant then seek to introduce, uh, expert testimony of his impairment, uh, by calling an expert witness on point? Yes, he did, Your Honor. And, uh, was that testimony excluded? There was a single line of testimony excluded. And here's what happened. At the time this case went to trial, everyone believed, including defense counsel, that this expert capacity opinion, uh, Dr. Smith's opinion on whether a petitioner was so intoxicated that he couldn't form the intent to kill was actually precluded under Oklahoma law. And I'll read to you from that. Just a second. Don't go too fast because yesterday we had a lawyer arguing so fast that I finally had to say, look, if we can't understand you, we can't help you. So slow it down. Yes, Your Honor. Judge Hartz had to step in and we finally gave the young lady advice at the end of the argument that she enrolled in an undergraduate course in rhetoric, uh, because she asked anything that we could do to help, we would. And so I thought that was the best she could do. I'm not going to advise you to go to a course in rhetoric, but just slow it down. All right. Okay. Yeah. Because I'm trying to follow you and the, the, the logical premises here. And, uh, slow it down. Okay. So start again. So, uh, when it came time to discuss Dr. Smith's upcoming testimony, the trial court asked defense counsel, do you intend to ask Dr. Smith, whether your client was capable of forming the specific intent of committing the crime? And defense counsel responded, Your Honor, we would make that question and his answer as an officer, he responded, what, uh, we would make that question and his answer as an offer of proof for the court, because we know that white versus state states that an expert cannot testify as to that particular aspect. So that's one clarifying point I would like to make is that everyone at the time, including defense counsel, believed that the capacity opinion was. Excludable. That was, was prohibited under Oklahoma state law. Yes. But then what happened, we had the trial in 2003 and then in 2004, while petitioners direct appeal was pending, the court of criminal appeals decided a case called Johnson in which they seem to expand that area of the law and said you could introduce this kind of testimony. And then when they decided petitioner's case, they did say very clearly once and for all that this kind of cap capacity opinion is admissible under Oklahoma law, but it is not the case that this was some type of arbitrary or disparate application of the rule. The trial court and the parties simply misunderstood the law and believe that this was not admissible under Oklahoma law. But in fact, the correct ruling, anticipating that second case would have been that the testimony should have been allowed. Yes, Your Honor. That's correct. Yes. So why isn't that a, a, a violation of the state granted right to introduce evidence of intoxication impairment? The only case that petitioner has cited for that theory is Hicks. Um, and, and I'll answer your question, but first I'll just reiterate that. I very much appreciate the level of your candor. Yes, that it is, um, a brand new, unexhausted, forfeited and waived claim. However, even if we look to the merits of that, what happened in Hicks is a, uh, a person is deprived of a state created right to jury sentencing and courts have interpreted Hicks basically to stay, say that it stands for the narrow proposition that some state created rights are so fundamental that it basically creates a liberty interest in that right. And you can't be arbitrarily deprived of it. And, um, petitioner has cited no case suggesting that the state law right to introduce the capacity opinion is on that level, that it's so fundamental. It's like what happened in Hicks and that it would be an arbitrary deprivation. And as far as the, um, right, the right to present a defense line of cases, uh, petitioner continually attempts to distinguish his cases based on the state law right, but that shows only an error of state law, um, to follow his logic. But under error, uh, error of state law can result in a Hicks violation. Can it not? Yes, Your Honor. I think in limited circumstances, like what happened in Hicks, if it is such a fundamental right, and I don't think there's right to be more fundamental than the right to introduce evidence that, uh, you, in intoxication prevented you from forming the specific intent necessary to commit the crime, to be convicted of the crime. I think if it were a case where it was excluded on whole, if it was an exclusion much greater than what we have here, I asked Mr. Carlson, if there was other evidence, uh, that was introduced that we could look at, look at that could have been substituted for that evidence. And I think his answer, uh, was no. And I disagree with that, Your Honor. Um, this, this claim comes down to one line, six words. Um, what, what Dr. Smith was not allowed to say was at the time of the murder, petitioner was not able to form the intent, the intent of malice of forethought. He was able to say in his opinion, to a reasonable degree of medical certainty, petitioner was not able to think reasonably and rationally on the day of the murder. So six words, um, form the intent of malice of forethought. That's all that was excluded here. Uh, there was no, and, and also as, um, judge Moritz pointed out, the petitioner six words, yes, to form the intent of malice of forethought. That was the only thing that Dr. Smith was not permitted to say. Well, bloody well, that seemed to be the most critical point, right? And Mr. Carlson made that argument that he was allowed to testify on everything, but, but the point that was really the, the money shot. Yes, Your Honor. And I'll explain now why that was not, um, outcome determinative and not critical. Even had Dr. Smith said these words, which I call his capacity opinion as shorthand, the jury was not required to accept that opinion. The jury was instructed, instructed in instruction number 20. You may consider the testimony. I'm sorry. And this is as to expert witnesses. You may consider the testimony of these witnesses and give it such weight and value as you think it should have, but the weight and value to be given their testimony is for you to determine. You are not required to surrender your own judgment to that of any person testifying. How is this relevant? I mean, if he's, if, if you tell the jury, you can consider all the evidence this expert gave, uh, but you don't have to set aside your own, your own, uh, thinking processes in the process of listening to it, uh, or your own judgment. Uh, but they didn't hear the evidence in the first place. Uh, I don't see how that helps the state in any way. I mean, I just, or, or helps the defendant either. I usually get so relevant. Because what my point is that the jury was not bound to accept that capacity opinion, even if there was no capacity, right? And that's what I'm about to explain. Mr. Carlson, please don't itch. Just tell us, I'd say the same thing to you. Please don't about to explain, just explain. Sure. Um, so here are all the reasons that the jury would never have accepted the capacity opinion, even had it been given. Um, and so the first thing I want to talk about is the timeline, as far as the degree to which petitioner would, so this is kind of a harmless. Yes, Your Honor. Exactly. This I'm sorry. And this goes back to my opening point and I didn't make that clear, but, uh, the, the points I wanted to get across to this court had to do with why this court should find the court of criminal appeals, harmlessness, determination, reasonable, and why this court should have no great doubt under Brecht. Um, so as to the timeline, petitioner, uh, bludgeoned 73 year old Al Hale four times in the head around 6 30 PM on March 5th, 1997. I'm spotting you that you would agree that that is, that's not rational. Hitting some killing, killing somebody over the head with a claw hammer is not a rational act. I think it was completely rational under these circumstances because petitioner didn't want to go back to prison. Am I missing her? I mean, what's rational about that? Uh, petitioner went there with the express purpose to obtain more money for more cocaine. And, uh, when Mr. Hale refused to give it to him, he bludgeoned him repeatedly. So then he could take the money and leave. And, and so I, I think it was rational in that sense. Is the killing to get the money? Yes, exactly. Like it had a purpose. It's rational in that sense. That was his purpose. So are you saying it's the nature of the bludgeoning the, the four times with the hammer that somehow established his intent to kill him rather than simply maim him or decapacity, you know, incapacitate him sometime, somehow, because I'm, I'm struggling with that. Yes. I think those are some of the things that factor in what I'm, what I'm trying to get here is the totality of the circumstances. And yes, I think it's relevant that he continued to hit him after the first time. Um, but, but my point was actually, I was trying to establish the timeline as to his level of intoxication that the killing happened around 6 30 PM that day. And the last robbery that had occurred before that was around 2 30 AM. So around 16 hours before the murder and a petitioner, as I just said, admitted he went to Mr. Hill's house because he needed more money for cocaine. He admitted on the stand that every time he committed a robbery and got money, he would immediately buy cocaine, would immediately spoke it up and wouldn't save it for later. Uh, he said he, he didn't also testify that he went into the bathroom and use cocaine while he was there at the home. That's correct, your honor. But that was when he said that on the stand, it was the first time he'd ever said that in five years. He testified to it. You're, you're absolutely right, your honor. But, um, as, as far as weighing, uh, how the jury would have evaluated this, uh, this capacity opinion, had it been given, it's relevant that he did not say that during his police interview. He did not say that during his meeting with Dr. Smith. And in fact, Dr. Smith said on the stand that it was his understanding that it was sometime in the hours before petitioner went over to Mr. Hill's house that he had last used cocaine. And, and then, um, Dr. Smith said that generally without, um, using additional cocaine, the actual high is over in about 20 to 30 minutes. And that's on page 24 of the, uh, volume six of the trial transcripts. And it's only after hearing Dr. Smith's testimony that petitioner gets on the stand and for the first time ever in five years says I used cocaine in, um, in Mr. Hill's bathroom. Um, and, and so I think that all of this circuit, the fact that it had never been said before, and the question of why he would save cocaine all day having before said, I smoked it up immediately. Um, and also it, it undermines, um, Dr. Smith and that he, he, he never says how he could be so intoxicated that he lacked self-awareness, which was something he was absolutely allowed to testify about. Um, despite the fact that the high is over in 20 to 30 minutes and, and, um, by his own evaluation of petitioner, he had believed to have been hours since petitioner had used cocaine. Um, the other point I want to make as to harmlessness is the, the test, um, for intoxication is petitioner has to show that at the time of the crime, his mental powers were so overcome through intoxication that it was impossible for him to form malice of forethought. And the two manifestations that, um, Dr. Smith, uh, discussed at length were one that petitioner would lack self-awareness and two that petitioner would have memory deficits and sorry, memory deficits. And, and the, the evidence did not show these things. And before I discuss the evidence, I want to take a moment to discuss specifically, uh, Dr. Smith's testimony as to memory deficits. Um, petitioner makes the claim in his reply brief that his memory of the crime is not inconsistent, um, with, uh, intoxication. However, Dr. Smith said in his report that petitioner had a spotty memory of the crime. And while Dr. Smith also says that cocaine intoxication wouldn't interfere pervasively with memory and that there wouldn't be a complete blocking of memory of what one has done, that suggests that you would have some memory deficits. It wouldn't be pervasive. And, and the problem for petitioner is he has a total lack of memory deficits. Um, as I described in my brief, there are numerous details he remembers, and I would also, um, direct this court to pages 12 to 24. Your argument is he wasn't, as a matter of fact, intoxicated or influenced. Yes, I think, I think either he, uh, was not intoxicated. I mean, I think the testimony from Dr. Smith is that cocaine could, even if your high was over, your judgment could be just a second. Let me make sure I follow the rational thought here. The testimony would have been that in the opinion of the doctor, the defendant was influenced by intoxication under Oklahoma law. Yes. And you're arguing that the, the, that he was not intoxicated because why? Well, that first, the timeline, it makes no sense that he saved this cocaine all day. And that the intoxication, the height of the intoxication would have been 30 minutes after consumption or after use or whatever you do with it. Uh, but that doesn't mean you're not under the influence. It just means that the peak was at a certain point, right? And I totally agree, Your Honor. And Dr. Smith made that point. In fact, he showed brain scans to the jury that said even 10 days out, 90 days out, your judgment, your frontal lobe is still affected. So yes, I agree that the cocaine would still have some effect on him. But the question is, and what he had to show is, did it render him so intoxicated that he was unable to form the specific intent to kill? And two manifestations of, of, of Dr. cocaine was that he would have a, that he had a spotty memory and a lack of self awareness. And so my point is, when you look at all of the evidence, it absolutely does not show either a spotty memory or a lack of self-awareness, but, but yes, I agree with your honor that it would still have some effect on him. Well, I'm not, I'm not arguing his case. I mean, that's not my role and I'm not saying he was or wasn't. I'm just trying to understand your argument. I think your argument is that this is harmless because he wasn't intoxicated, but now you're saying that he would have been influenced, that it could have been. I mean, I don't know. I'm sorry, your honor. I'm just having trouble following the argument. Sure. Um, so one of the things Dr. Smith said is that the degree to which the cocaine affects you is related to the time when it happened. In other words, as time goes on, you're less under the effect. And so my point is just, it's, I think it can be either thing, whether he did smoke cocaine in the bathroom, he, and, and was intoxicated at the time. He's still, it's one of the ways you can consume it. And it's how petitioner said he used it. And that apparently produces the fastest high, um, whether he used cocaine in the to the point of not being able to form intent because the measure of that is the self awareness and memory deficits. So I think that even if he was high, he's, we still don't have that, those markers. Um, and then my alternative point is that it, the, there was also a lot of evidence to suggest he was not high at that time. And, and, excuse me, and it had been hours since he used cocaine. And based on Dr. Smith's testimony that the, um, effects lessen over time that again, undermines that capacity opinion and, and shows why no jury would have accepted it even had it been rendered. Um, could you address his, uh, argument about, uh, what, what's the proper pathway for us to take, uh, in light of your argument about the lack of clearly established law, federal law, uh, with respect to the actual denial of the, uh, opinion evidence, um, capacity evidence. Um, he suggests that we, because he's, he points to Ayala and suggests that because we are, the challenge here is to the harmless error that, and we do have clearly established federal laws to the harmless error standard. And there's a question about what that is here, but why isn't that our pathway instead of the way that you, I think you approached it in your brief, which is to first discussed the clearly established, the existence of clearly established laws to the, the right to present the testimony itself. Uh, is he correct about that? Do we approach it first from the harmless error and then go to, if we get past that? No, Your Honor. And first, um, as, as you discussed, um, with petitioner's counsel, we have House v. Hatch that describes it as a threshold showing. Um, and I agree it, it's not, it's not perfectly on point. I can't point to a case that is perfectly on point with this issue. Um, as far as his point about Ayala, honestly, I have not read it recently enough to remember the, um, the constitutional. Why isn't the threshold issue here? Do we have clearly established federal law as to the harmless error standard? Yes, we do. That's his argument. That's true. But, um, as far as the, um, clearly, the clearly established law requirement, um, besides the characterization as a threshold requirement, it is somewhat a policy argument that, um, it, it seems strange to punish a state court where it's. Interpreted the constitution more favorably than clearly established Supreme Court law requires with more review, whereas another state court finds no constitutional error and we have no clearly established Supreme Court law to then say, you know, review would be cut off at that point because of the lack of clearly established law. Um, and so basically I'm making, it is a policy argument combined with, um, House v. Hatch's language that this is a threshold determination. And as far as Ayala, um, I, I, I don't recall the constitutional error issue there, but I don't know if there was an argument made that we had to make, um, a threshold showing that it was actually constitutional error under clearly established. But in house, the state Supreme Court, New Mexico court, I believe hadn't found as we have here, a constitutional error. You're right. Your honor. That's a big distinction as far as where we look at that threshold issue, I guess. Yes. And, and I agree that, um, that that is a distinction and I, and I don't have a case perfectly on point. Um, and, and that I, and when I wrote my brief, I, um, had to make a decision about how to set it out and I kind of finally separated those, you know, the question of whether there's federal constitutional error and then whether there's clearly established constitutional error. Um, because I, I think the, the former is probably more clear. I mean, it's, it's definitely a fundamental tenet of habeas that you have to have federal constitutional error. Um, uh, see, for example, Estelle B. McGuire and, um, and it, I admit it, it's, it's less clear as to the clearly established law requirements. Um, but, but that is my position there. And the other thing I would add. What's your best case for there not being any federal constitutional error? Um, I think it's probably a combination of, um, Sheffer and Clark. And you cited those in your, in your 28-J rights. And so what happened is when I, when I briefed it, I, I tried to make that point that federal courts have drawn a distinction between capacity opinions and the other types of evidence you can present, um, in support of this kind of claim and have said, it does not violate your right to present a defense. And I think that is only reinforced by Clark and Sheffer, um, that these, uh, a weighty interest of the accused and, and, and back to the point that petitioner has to course, neither of those cases involved a state where we have state common law here that actually establishes the right to present this opinion testimony. Yes. And that's where I think two points, um, first, like I said, I think that sounds more like his Hicks claim, which is totally forfeited and waived. Um, and, and also not fundamental like Hicks. And the second thing is, as far as the right to present a defense case, the only difference I see that that makes from these other right to present a defense cases is he's shown a state law error. Um, it, it, it doesn't then follow automatically that he has, that he's shown a federal constitutional violation. Other, otherwise I think that would make a novelty of the rule, um, in Estelle that, um, there has to be more than just a violation of state law. And, and so he has to go on then and, and still make the same test. In other words, whether it's an allegedly unconstitutional, um, evidentiary rule or an allegedly unconstitutional trial court ruling, like he's claiming here, he still has to show, um, that a, a weighty interest, um, was a friend infringed, um, and, and so. Well, I mean, if that were the test was a weighty interest infringed, uh, I, I just have a hard time from where I sit saying that the deprivation of the, of the right or the deprivation of an offer to introduce evidence of impairment at the time of the commission of the crime, which is authorized under and which is permitted under Oklahoma state law is not a weighty interest. I mean, if that's the test, holy cats, that, that seems to me not a very hard question to answer. The more difficult question for me to answer is the line that you were following is to say, well, even though that right may have been, uh, impaired, this was Again, I, I, I pause, uh, because I think you're telling me that the reason it's harmless is because you feel that the jury would have found him not to be impaired because of his ability to recollect events, which is a marker.  His self-awareness, Your Honor. Self-awareness, which is a marker. Yes. Your Honor, can I go back to your first point? Right. Yes. And I'd like to perhaps, perhaps Mr. Carlson will address those two points in his argument. Okay. Um, so the first thing I want to be clear back to the six lines of testimony that was excluded. Yes. There was not any factual or observational testimony excluded. No evidence about cocaine intoxication was excluded. Um, Dr. Smith was able to give his expert opinions about petitioner's cocaine dependency and the effect it had on petitioner's brain. It truly comes down to these six words. There was a wealth of evidence, um, through petitioner's ex-fiance, Michelle Martin, through petitioner himself, um, through Dr. Smith and his review of records, his, um, review of, of, uh, summaries basically from petitioner's family about his history of cocaine use. Uh, Dr. Smith testified to why petitioner was more vulnerable to cocaine intoxication that he had a history of head injuries and an early exposure to alcohol. Um, all of that came in this, this claim really comes down to, to this, this, these six words with this capacity opinion. And so that is my point that there was not a weighty interest infringed. Um, and the Supreme court has drawn a distinction, uh, between the kind of factual observational evidence and all of the kind of evidence he did get to put in versus the expert capacity opinion. Um, and then to your second point, your honor, you're absolutely correct that, um, it, it, why this capacity opinion would not have been accepted comes down in particular to the, the lack of memory deficits, the lack of self-awareness. Um, and, and I want to talk more about the self-awareness. Petitioner says that after he bludgeoned Mr. Hale, he looked down and realized what he'd done and no reasonable juror would ever have accepted that his mental powers were so overcome that he couldn't intend to kill, but that immediately thereafter he realized what he'd done and thought to take money from Mr. Hale's pocket. Um, and another evidence of, of self-awareness is petitioner says he started to take Mr. Hale's rings off, but could, couldn't do it again, demonstrating that his mental powers were sufficiently intact for him to feel guilty. And that also, uh, contradicts Mr. Smith's opinion that he was allowed to give that, uh, severe cocaine intoxication affects one ethic, one's ethics. And so that is a moment where petitioner showed both ethics and self-awareness. Um, petitioner testified that he left Mr. Hale's house without contacting the police because he didn't want to get caught. He washed his hands in the kitchen sink and wrapped the murder weapon, the hammer in a newspaper. He was able to drive himself away, uh, make the 20 minute drive to Oklahoma city to buy more cocaine. Afterward, he disposed of the murder weapon and washed his clothes. He returned later to try to take some of Mr. Hale's possessions to pawn them. But then he saw police lights again, showing his awareness and I'm sorry, and turned around and left again, showing his awareness that he'd done wrong and his desire not to get caught up or excuse me, to get caught. And, and to sum up for the three reasons, because I want to ask you a question, if I, if I may, please, we're going to go off the clock here, not off the clock, but extend the clock because we'll have to treat Mr. Carlson with the same equivalence. The question I have is this, just to summarize the, uh, your argument, the, uh, the, under Oklahoma law, he had the right to introduce evidence of impairment. The judge did not allow the ultimate opinion on that point because of his understanding of Oklahoma law, which, which he interpreted to mean that he was not allowed to introduce that evidence. And subsequent to that, the court of Oklahoma court of criminal appeals ruled that the evidence is admissible, is admissible, which means that it should have been admitted, uh, and what is the consequence of that from your perspective? Does that mean that the judge, that we have to presume the judge's ruling was wrong given the, the reflection of the later reflection of the Oklahoma courts? Yes. As a matter of state law. Yes, because the court of criminal appeals, it was interpreting both its recent case Johnson, but also its prior cases. And so I think the court of criminal appeals has the final say on that. And even though everyone at the time was interpreting it differently said, yes, under Oklahoma law, this should have been admitted. So I think it's a matter of state law. And I'm not, believe me, I'm not at the gotcha game, but are you basically then conceding that under Oklahoma law properly applied that ruling was erroneous and that you must resort in the, we must resort to a harmless error to the same harmless error review that the Oklahoma courts applied into the district court applied? Only in part, your honor, I concede that it was a matter, it was an error under state law, but I still think this court has to make a preliminary determination of whether it was federal constitutional error, which would then allow this court to apply harmless error review, review what the court of criminals did under Chapman. But only if we get past harmless error first, but only if we get past harmless error first, at least according to Mr. Carlson, I don't agree with that position. Okay. I think there's still, I mean, there is some importance in the way we, you know, the pathway here. Right. I, I think that it is a threshold determination and, and even setting aside, I think the more unsettled question of whether the clearly established law requirement applies at that time, I do think you, this court would need to first find before you get to harmless error analysis, whether it's federal constitutional error. I mean, I think in a simpler case where we just had, you know, it's clearly simply state law error, it would be unavoidable. Like that can't open the door to harmless error review in federal court. And I contend this, this case, case should be in the same boat, that there has to be that preliminary determination that this is federal constitutional error before this court proceeds to harmless error review. All right. Thank you very much. And we'll extend three minutes to Mr. Carlson's time. Thank you. Thank you. I'll ask this court to affirm the denial of habeas relief. Yes, we really do have a disagreement about the order here. Um, I think the order that I set out is consistent with Williams and Andy versus Corderman, the harmless error cases, Plyler, Ayala, the threshold requirement is to, that I have is to attack the state court judgment, it's adversity. And that's the harmlessness determination. I make it through that. I still have to show constitutional error under Bernal, but you know. Well, you don't have to do anything. It's the defendant ultimately who has, you're advocating on his behalf. And it's, I think more helpful to analyze the law purely without getting all this involvement of what you have to do and don't have to do. Uh, would you please answer Judge Moritz's question? And that is the order that, uh, that, uh, in your point of disagreement as to the order of presentation of the harmlessness, if you understand my question. I, I, I, I guess I don't. We pursued this case to the point where counsel says, yes, there is probably state error in the court, not allowing. Oh, I don't think there's any question that you, you are bound to accept the OCCA state law determination that the evidence was wrongly excluded. You are not bound. I'll proceed to accept the constitutional error. You are part and parcel of the OCCA's harmlessness determination was they had to get there because they found it to be material and a constitutional error. So I guess you're asking us to overlook that aspect of their harmlessness determination as though it were just separate and apart from, from that issue. I don't think so. I'm asking, I'm going to use the materiality finding in, in, in two ways. First to show that it's an unreasonable application of Chapman for all the reasons that I don't need to repeat. It's just unreasonable to say material evidence is harmless. Now you're free of 2254 D. You must define a constitutional error under 2254 A. I, Mr. Coddington has to be held in custody in violation of his federal constitutional rights, but we're free of 2254 D. The touchstone is Valenzuela versus Bernal, which requires a right to present a defense claim to rest on the unjustified or arbitrary exclusion of material evidence, which is to say reliable and important evidence. And I do think while you're not bound by the OCCA's materiality judgment under your de novo review, I do believe you are bound by the subsidiary factual findings, implicit and explicit in that finding. When I think that's a, those are factual findings that are presumptively correct because while I have surmounted 2254 D's precondition on relief, I'm still able to draw on 2254 E's presumption that a factual, of the correctness of factual findings by the state court materiality, I acknowledge it's not a factual finding, but it consists of factual findings high on that list is that Mr. Dr. Smith's evidence was reliable and important to the defense. I think you are bound by those. But ultimately it's a legal finding. Materiality. Right. And ultimately you need to make that call to know under de novo review. But I think that question has to be informed with some deference to the subordinate facts that inform the OCCA's materiality judgment. I wonder if I can talk briefly about the Hicks argument because I'm not making a new claim. My claim is the right that Mr. Coddington was denied his right to present a defense. I bring, brought forward Hicks because I, in all candor, it, it, I do have a, I an anomaly. What I have is a Chambers error. But one thing you'll notice in the Chambers lines of cases is that the state evidentiary ruling rule or, or judicial decision was itself the constitutional problem. I, I, you know, in other words, Chambers wasn't allowed to impeach his own witness under Mississippi law. And the Mississippi courts upheld that, the exclusion of, of his, he was trying, his, his, of a participant whom he thought said. Of course, we don't have a complete, we don't have that at all here. And in fact, as counsel, as state's counsel points out, the Supreme Court has made those kinds of distinctions, for instance, in Clark between this type of, it's not factual evidence we're talking about here. And there's a difference in the weight to that. Don't, don't be lulled into complacency. Well, the Supreme Court has made that distinction in Clark. And they've specifically said in that case that the opinion testimony, there was no violation of a due process right there. Remember the background state law. Clark was prohibited under state law from presenting this evidence. Mr. Coddington was not. And I don't think you should be complacent about the importance of the evidence excluded here by treating it as mere opinion. For de-factualizing Dr. Smith's opinion, this is something important about the element, the mens rea element disputed here. Well, the court was a factual determination. The Oklahoma court has already ruled in your favor on that point in its second opinion, correct? On saying that it's error to exclude the opinion of it under state law. But as I acknowledge, I, Mr. Convince you that that exclusion violated his federal constitutional rights. And you are not bound by the OCCA's determination. You are free to reject that. I think you're subject to those subsidiary factual findings. And I think it's going to be difficult for you to come to a different conclusion when you apply Valenzuela under de novo review. But if I could go back to the opinion, the mere opinion evidence, it's understanding something critically important about the element. Mr. Coddity either did or did not have the requisite mens rea. That's a factual determination. And the jury was denied reliable and important evidence from a credential expert stating that he did not have that intent as a matter of fact. Now this isn't to deny that mens rea draws on subjective moral choices, but in the first instance under Oklahoma law, it's a factual determination. Now I started to say, the reason I introduced Hicks is to acknowledge that unlike the chamber's lines of cases, I don't have a problem with Oklahoma law. I'm embracing Oklahoma law. That's what Hicks adds to this discussion. It's not a new claim. It's just an argument, an authority for you to grab onto as you see the way I define the error, which is, as I said at the beginning, not the exclusion, quad exclusion, it's the exclusion of Dr. Smith's opinion embedded in a state law defense that he was entitled to exercise. What do you mean? I thought you, I had you up to the point where you said you were going to rely on fancy rhetoric, and I don't understand what you said. I'm a little plain thinker, so just walk me through a little more plainly, please. Instead of having me follow you like a lemming off the cliff. I suppose I've been accused of worse things. Well, at appellate argument stage, we've got to understand you to help. You do. To be clear, I am not making a new claim for relief under Hicks. I'm not changing the basis, the legal basis for my claim. I'm informing your analysis with a Supreme Court case that recognizes that a state can create rights. When, when can, but what makes that state created right? It's so fundamental. What makes, in this case, in light of other Supreme Court and federal law that we have, including a federal rule of evidence that excludes it, what makes it so fundamental? The, it's the chamber's line of cases informs that decision. And under de novo review, what you have to decide is whether or not the state arbitrarily excluded relevant material, important evidence critical to the defense. And those are the elements that are, that, that, that, that, that, that on which your analysis must depend. And let's take them one at a time. There's no state interest by definition in excluding this evidence. It was erroneously excluded under state law. Let's take the reliability of the opinion because, because I wouldn't be standing here if Dr. Smith's opinion, if I conceded that Dr. Smith's opinion was unreliable, because it's, there's nothing wrong with excluding unreliable evidence. But the OCCA called his evidence, called his testimony, said it would have been helpful, called it material. Implicit in that is its reliability. And I think it was critical to Mr. Cotting's defense because it and it alone negated an element. All those elements combined, in my view, to establish a violation, not of the Hicks claim, but of the right to present a defense. Is there any, if there are no further questions, I rest. Thank you. Case is submitted. Counselor excused. Thank you both for your argument this morning.